IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| GARY M.,[1] | Case No. 3:20-cv-00631-JR |
| Plaintiff, | OPINION AND ORDER |
| v. | |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | |
| Defendant. | |

RUSSO, Magistrate Judge:

Plaintiff Gary M. brings this action for judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his application for Title XVI Supplemental Security Income ("SSI") under the Social Security Act. All parties have consented to allow a Magistrate Judge enter final orders and judgement in this case in accordance with Fed. R. Civ. P. 73 and 28 U.S.C. § 636(c). For the reasons set forth below, the Commissioner's decision is affirmed, and this case is dismissed.

---

[1] In the interest of privacy, this opinion uses only the first name and initial of the last name of the non-governmental party or parties in this case. Where applicable, this opinion uses the same designation for a non-governmental party's immediate family member.

Page 1 – OPINION AND ORDER

## PROCEDURAL BACKGROUND

Born in September 1969, plaintiff alleges disability beginning October 21, 2016, due to traumatic brain injury, poor vision and balance, poor memory, chronic lower back pain, obesity, high blood pressure, and high cholesterol.[2] Tr. 209, 232. His application was denied initially and upon reconsideration. On September 17, 2018, and February 6, 2019, hearings were held before an Administrative Law Judge ("ALJ"), wherein plaintiff was represented by counsel and testified, as did a vocational expert ("VE").[3] Tr. 31-67. On February 26, 2019, the ALJ issued a decision finding plaintiff not disabled. Tr. 15-25. After the Appeals Council denied his request for review, plaintiff filed a complaint in this Court. Tr. 1-6. On May 3, 2023, this case was reassigned to the Judicial Officer below (doc. 24).

## THE ALJ'S FINDINGS

At step one of the five step sequential evaluation process, the ALJ found plaintiff had not engaged in substantial gainful activity "since October 21, 2016, the application date." Tr. 17. At step two, the ALJ determined the following impairments were medically determinable and severe: "degenerative disc disease, obesity, and eye disorder." *Id.* At step three, the ALJ found plaintiff's impairments, either singly or in combination, did not meet or equal the requirements of a listed impairment. *Id.*

Because he did not establish presumptive disability at step three, the ALJ continued to evaluate how plaintiff's impairments affected his ability to work. The ALJ resolved that plaintiff

---

[2] Plaintiff initially alleged disability as of October 27, 2001, but amended the onset date at the hearing to correspond with the prior SSI denials and his application date. Tr. 34, 42-43, 78. As discussed herein, plaintiff fell off a ladder while on-the-job in 2001, fracturing several bones including his skull, and has been seeking disability benefits since that time.

[3] Plaintiff's first hearing was terminated prematurely after it came to light that he had smoked marijuana "[a]bout an hour" prior to the hearing. Tr. 37.

Page 2 – OPINION AND ORDER

had the residual function capacity ("RFC") to perform medium exertion work as defined in 20 C.F.R. § 416.967(c) except:

> [He] cannot climb ladders, ropes, or scaffolds. He cannot perform work that requires fine acuity and depth of field demand, and he would do best with work with straight-ahead visual demands. He should avoid exposure to hazard, such as unprotected heights and heavy equipment.

Tr. 18.

At step four, the ALJ determined plaintiff had no past relevant work. Tr. 24. At step five, the ALJ concluded, based on the VE's testimony, that there were a significant number of jobs in the national economy that plaintiff could perform despite his impairments, such as rack loader, off loader, and cleaner II. *Id.*

## DISCUSSION

Plaintiff argues the ALJ erred by: (1) failing to account for all of his severe physical impairments at step two; and (2) discrediting his subjective symptom statements.

**I.     Step Two Finding**

Plaintiff first contends the ALJ erroneously neglected to find his left shoulder calcific tendinitis and diabetic polyneuropathy severe at step two. At step two, the ALJ determines whether the claimant has an impairment, or combination of impairments, that is both medically determinable and severe. 20 C.F.R. § 416.920(c). An impairment is medically determinable if it is diagnosed by an acceptable medical source and based upon acceptable medical evidence. 20 C.F.R. § 416.921. An impairment is severe if it significantly limits the claimant's ability to do basic work activities. 20 C.F.R. § 416.922.

The step two threshold is low; the Ninth Circuit describes it as a "de minimus screening device to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996) (citation omitted). As such, any "error at step two [is] harmless [if] step two was decided in [the

claimant's] favor with regard to other ailments." *Mondragon v. Astrue,* 364 Fed. Appx. 346, 348 (9th Cir. 2010) (citing *Burch v. Barnhart,* 400 F.3d 676, 682 (9th Cir. 2005)).

Here, the ALJ found that plaintiff had a number of medically determinable and severe physical impairments at step two. Tr. 17. The ALJ acknowledged evidence of other conditions, such as blood tests showing elevated blood sugars and x-rays of plaintiff's shoulders and hips but found "there is nothing to show that these non-severe impairments are of such severity as to cause more than minimal vocational limitations." Tr. 17, 20. The ALJ continued the sequential evaluation process and formulated an RFC that considered evidence pertaining to plaintiff's left shoulder and foot pain. Tr. 18-24; *see also* Tr. 17 ("[a]ll impairments, both severe and non-severe, received consideration when formulating the residual functional capacity assessed in this decision"). Under well-established case law, any alleged error at step two error was harmless.[4] *See, e.g.*, *Buck v. Berryhill,* 869 F.3d 1040, 1048-49 (9th Cir. 2017).

## II. Plaintiff's Testimony

Plaintiff contends the ALJ erred by discrediting his testimony concerning the extent of his impairments.[5] When a claimant has medically documented impairments that could reasonably be

---

[4] This is especially true given that plaintiff does not argue that his left shoulder calcific tendinitis and diabetic polyneuropathy meet or equal a listing at step three, nor does he cite to any medical opinion evidence endorsing additional limitations as a result of these impairments. *See, e.g.*, Pl.'s Opening Br. 5-10 (doc. 19). Indeed, the only medical opinion from a treating or examining source – dated March 2017 – does not list any symptoms or diagnoses related to plaintiff's shoulders or feet. Tr. 1070-75. Although, as addressed in Section II, plaintiff thereafter had occasional complaints of neuropathy and shoulder pain, he did not indicate an inability to work due to these impairments at the hearing, which is overall consistent with the record.

[5] Alternatively, plaintiff argues that the ALJ should have further developed the record in regard to his allegedly disabling back pain. Plaintiff is correct that the only back imaging study in the record before the Court is from well before the alleged onset date – i.e., an April 2010 lumbar x-ray showing "[m]ild degenerative joint disease in the posterior facet joints at L5-S1" and calcium build-up in plaintiff's abdominal aorta and Iliac arteries. Tr. 625. However, the claimant bears the burden of proof at steps one through four, and the fact that plaintiff's treating medical providers

Page 4 – OPINION AND ORDER

expected to produce some degree of the symptoms complained of, and the record contains no affirmative evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of . . . symptoms only by offering specific, clear and convincing reasons for doing so." Smolen, 80 F.3d at 1281 (internal citation omitted). A general assertion the claimant is not credible is insufficient; the ALJ must "state which . . . testimony is not credible and what evidence suggests the complaints are not credible." Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993). The reasons proffered must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." Orteza v. Shalala, 50 F.3d 748, 750 (9th Cir. 1995) (internal citation omitted). In other words, the "clear and convincing" standard requires an ALJ to "show [their] work." Smartt v. Kijakazi, 53 F.4th 489, 499 (9th Cir. 2022).

Thus, in formulating the RFC, the ALJ is not tasked with "examining an individual's character" or propensity for truthfulness, and instead assesses whether the claimant's subjective symptom statements are consistent with the record as a whole. SSR 16-3p, *available at* 2016 WL 1119029. If the ALJ's finding regarding the claimant's subjective symptom testimony is "supported by substantial evidence in the record, [the court] may not engage in second-guessing." Thomas v. Barnhart, 278 F.3d 947, 959 (9th Cir. 2002) (internal citation omitted). The question is

---

did not recommend further imaging based on his treatment history does not somehow equate to an ambiguity or inadequacy in the record. *See* Mayes v. Massinari, 276 F.3d 453, 459-60 (9th Cir. 1999) ("[a]n ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence"). As discussed herein, beyond medication management, plaintiff did not seek any treatment for his allegedly disabling back pain during the adjudication period. And, while "mild degenerative disc disease can have disabling effects," the cases that have found error in this context have generally been based on records containing other objective findings indicative of more severe impairment or that document consistent pain complaints and/or additional modalities of treatment. *Dahl v. Comm'r*, 2015 WL 5772060, *4-5 (D. Or. Sept. 30, 2015) (collecting cases). Therefore, the ALJ did not err in this regard.

Page 5 – OPINION AND ORDER

not whether the ALJ's rationale convinces the court, but whether the ALJ's rationale "is clear enough that it has the power to convince." *Smartt*, 53 F.4th at 499.

At the hearing, plaintiff testified he was unable to work due to "[m]y back and my vision." Tr. 54. Regarding the former, plaintiff recounted that he fell off a ladder in 2001 and was severely injured. Tr. 55-56. He rated his back pain "at a three [out of ten] every day, all day" but indicated that, if he bends over or walks too much, his pain increases. Tr. 58.

Concerning the latter, plaintiff explained that if he exerts himself too much, or watches too much television or looks at a book for too long, he gets double vision that, in turn, causes headaches. Tr. 54. He stated that two hours was the outer limit that he could watch television before needing to get up and move around, although that was due to his back pain and not his vision. Tr. 54-55. Plaintiff also testified that his "sleep pattern" had worsened over the years, such that he only gets "four to five hours of sleep total" per night, which causes daytime fatigue, poor concentration, and the need to take two-hour naps every day. Tr. 55-57.

In terms of daily activities, plaintiff indicated that he spends time with friends, cooks, goes grocery shopping, drives, does laundry and the dishes, takes out the garbage, sweeps, and, between May and October, spends 10 hours per week tending to his medical marijuana plants. Tr. 48-53. Although plaintiff did not specify any physical restrictions in regard to these activities, he did testify to getting distracted and losing concentration while doing chores. Tr. 60.

After summarizing the hearing testimony, the ALJ determined that plaintiff's medically determinable impairments could reasonably be expected to produce some degree of symptoms, but his "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons

explained in this decision." Tr. 18. In particular, the ALJ cited to plaintiff's history of conservative treatment and daily activities, and the objective medical record. Tr. 18-22.

Regarding daily activities, the ALJ found that plaintiff's ability to be "independent with self-care," perform "household chores such as laundry, vacuuming, and taking out the garbage," watch "television for several hours a day," visit friends, garden, and maintain "six marijuana plants, which he stated are between 10 and 12 feet tall," belied his subjective symptom statements. Tr. 18, 20. "Even where [daily] activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment." *Molina v. Astrue*, 674 F.3d 1104, 1112-13 (9th Cir. 2012) (superseded by statute on other grounds).

The record reflects that plaintiff engaged in a relatively large slate of daily activities. For instance, plaintiff's "Adult Function Report" and the "Third Party Adult Function Reports" from December 2016 to March 2017 demonstrate that plaintiff helps take care of pets, volunteered three times per week, cooked complete meals, gardened, watched television, spent time with friends, and did household chores such as laundry, dishes, grocery shopping, and yardwork. Tr. 254-55, 271-77, 287-88. Although plaintiff testified at the hearing that he last worked in February 2016, the record reflects that, in April 2017, he "lost his job at the marijuana farm." *Compare* Tr. 51, *with* Tr. 1111. Further, in July 2017, plaintiff reported to his medical provider that he "[i]s a marijuana grower and is physically active during the summer," which requires the use of additional oxycodone. Tr. 1118, 1120-21. While plaintiff proffers a more favorable interpretation of this evidence, the ALJ's interpretation must be upheld because it was reasonable. *See Febach v. Colvin*, 580 Fed.Appx. 530, 531 (9th Cir. 2014) (ALJ is not required to accept a claimant's attempt to characterize activities as consistent with disability where those activities "could also reasonably

Page 7 – OPINION AND ORDER

suggest" greater functional abilities) (citing *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004)).

The ALJ also relied on plaintiff's treatment history, which "has been routine, conservative, and not indicative of chronic or disabling symptoms," and the lack of objective findings indicative of significant restrictions. Tr. 19-22. "[W]hether the alleged symptoms are consistent with the medical evidence" and the type and dosage of the claimant's medications are relevant considerations. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1040 (9th Cir. 2007) (citations omitted). Similarly, "an unexplained, or inadequately explained, failure to seek treatment" is a clear and convincing reason to reject subjective symptom testimony. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).

An independent review of the record reveals that, with the exception of certain intermittent pain complaints, plaintiff's impairments were largely well-controlled with medication. On the few instances where plaintiff was offered additional treatment options, he declined to follow-up. Namely, the same month that plaintiff applied for SSI, he presented to his primary care provider, Cezary Wojcik, M.D., Ph.D., "to receive refills of controlled substances" and review recent lab work. Tr. 844. At that time, plaintiff reported his "[m]edications are working well, controlling symptoms, without much side effects" and that he had "no other concerns." *Id.*

Plaintiff next sought treatment in January 2017 "to receive refills of controlled substances. Medications are working well, controlling symptoms, without much side effects." Tr. 1046. He complained of "pain on radial aspect of right elbow especially with movement" but had "[n]o other concerns." *Id.*

In February 2017, plaintiff obtained an injection to treat his elbow pain. Tr. 1058. He also requested paperwork for his medical marijuana card and SSI claim. Tr. 1058-61. He returned in

March 2017, again seeking the completion of his disability paperwork. Tr. 1108-09. The physician's assistant, Ella Clark-Nicholson, saw plaintiff and instructed "that it would be ideal that his PCP complete this paperwork as his history is best know[n] by PCP." *Id.* However, she ultimately provided plaintiff with disability paperwork. Tr. 1070-75.

In April 2017, plaintiff presented to Dr. Wojcik "to have medications refilled. They are working well, there are no concerns or side effects." Tr. 1111. Plaintiff also denoted that "he has some shaking of his right hand at rest [and] has not seen any neurologist for last 10 years despite his TBI." *Id.* Dr. Wojcik referred plaintiff to neurology. Tr. 1117.

In July 2017, plaintiff sought care for his "[c]hronic low back pain," "[s]ome arm pain with sleeping on it," and "med refills oxycodone." Tr. 1118. At that time, it was noted that plaintiff had been engaging in increased activity – "[g]row[ing] medical marijuana and working on harvesting" – which made his pain "a little worse" such that he had been taking additional oxycodone. *Id.* His narcotic pain medications were refilled, despite his increased usage. Tr. 1118-23.

In September 2017, plaintiff made his first report of pain in his left shoulder, left elbow, left hand, left knee, and hips. Tr. 1123. He also complained of "episodes of shakiness 3x per week happening in both hands, worse in right hand. Lasts 10-15 minutes." *Id.*

Imaging studies of his shoulders and hips obtained the same day showed: "[t]race infraspinatus calcific tendinitis" in his right shoulder; "[o]ld, healed clavicular and rib fracture deformities" and "[s]upraspinatus-infraspinatus calcific tendinitis" in his left shoulder; and "[t]race spurring of both hips" and "[o]ld, healed left obturator ring fractures without acute abnormality." Tr. 1128-29. Based on these studies, Dr. Wojcik observed that plaintiff "has post traumatic injuries on the left" shoulder and "minimal degenerative changes" in his hips and advised that he follow-up with sports medicine and neurology. Tr. 1130-31.

Page 9 – OPINION AND ORDER

Later that month, plaintiff had his sports medicine consult. Tr. 1133. Plaintiff "complain[ed] of left shoulder and left hip pain since a fall in 2001 . . . Hurts to lift left arm out to side and overhead [and] to sleep on left shoulder . . . Left hip feels unstable every 3 steps. Has a sharp quick pain that goes away quickly. No pain at rest." *Id.* Upon exam, plaintiff demonstrated normal strength, a normal range of motion, and no tenderness, although he did experience "mild pain" with certain movements. Tr. 1134-35, 1137. Plaintiff was referred to physical therapy and low impact exercises – such as "water exercise, biking, yoga" – were recommended. Tr. 1137. Plaintiff was also instructed that he could obtain a "subacromial steroid injection" if "he has increased shoulder pain in the future." *Id.*

Plaintiff followed-up with Dr. Wojcik in October 2017, explaining he was "interested in increasing [his] oxycodone" prescription because "[h]e has a lot of pain in his left shoulder." Tr. 1138. Additionally, plaintiff questioned "whether he really needs to do physical therapy" and "why he needs to see a neurologist." *Id.* Dr. Wojcik informed plaintiff that "increasing the dose of oxycodone would be against clinic policy unless recommended by a pain specialist" and "advised [him] to follow to with his sports medicine provider about elbow pain and shoulder pain on the left." Tr. 1143. Plaintiff thereafter did not return to his sports medicine provider or otherwise seek physical therapy or injections for his allegedly disabling pain symptoms.

In January 2018, plaintiff again presented to Dr. Wojcik "to receive refills of controlled substances. Medications are working well, controlling symptoms, without much side effects." Tr. 1144. He also indicated that he "started having tingling and numbness in both feet when going to bed [and was] worried about high blood sugar." *Id.* Plaintiff's medications were refilled, and he was instructed on how and when to check his blood sugars. Tr. 1150. Later that month, plaintiff

Page 10 – OPINION AND ORDER

reported that the "[t]ingling in [his] feet is better," although his blood sugars remained uncontrolled. Tr. 1151. Plaintiff was prescribed metformin to treat his Type 2 diabetes. Tr. 1157.

In February 2018, plaintiff participated in nutrition counseling. Tr. 1160. At that appointment, plaintiff "[r]eport[ed] [his] toes are cold and tingling at night, which makes it difficult to sleep." Tr. 1161.

In March 2018, plaintiff presented for his neurology consultation. Tr. 1162. Plaintiff described "episodes of unilateral hand shaking [that does] not generaliz[e] to his arms or throughout his body" or cause a loss of consciousness. *Id.* "He first noticed [these episodes immediately after his accident] in the middle of November 2001." Tr. 1163. However, "[s]ince starting an antiepileptic 3 months ago, he has had a significant reduction in these episodes." *Id.* Plaintiff also reported poor sleep that "has gone on since waking up at the hospital" in November 2001 and "[n]o trouble walking but [he] gets tired easily. He has fallen down stairs approximately 5 times in last 3 years [from] not getting foot down properly. No shuffling. No freezing gait." *Id.* Upon exam, plaintiff exhibited normal gait, strength, reflexes, and sensation, with the exception that he demonstrated "[d]ecreased sensation in stocking distribution to ankles to vibration and temperature." Tr. 1167-68. The neurologist instructed plaintiff "to continue [his antiepileptic] dose at this time as it is offering him good control of his symptoms. I do not think that there is any further workup that needs to be completed at this time." Tr. 1163.

In April 2018, plaintiff sought care from Dr. Wojcik to "discuss [his] lab findings and receive guidance" regarding Type 2 diabetes. Tr. 1169. At that time, plaintiff divulged eating a healthy diet "but not doing enough exercise. No muscle pain, tolerating well prescribed medications." *Id.* He also "complain[ed] of not sleeping well since that time he had his traumatic brain injury." *Id.* Plaintiff was "advised [to try] melatonin" as a sleep aid and offered "specific

Page 11 – OPINION AND ORDER

medication to help with neuropathy symptoms" but plaintiff preferred to try to improve his glycemic control with diet and exercise. Tr. 1176-77.

In July 2018, plaintiff presented "to receive refills of controlled substances. Medications are working well, controlling symptoms, without much side effects. Also wants to go over lab results." Tr. 1179. He also "[s]till has burning sensation in both feet which is most troublesome at night. Otherwise, no chest pain no short muscle rest and no other concerns." *Id.* Plaintiff's blood sugars had improved slightly but his weight had increased. Tr. 1185. He was started on gabapentin for his foot neuropathy. Tr. 1186.

Later that month, plaintiff underwent his annual eye exam. Plaintiff indicated his vision "is OK for distance, no eye pain, no floaters." Tr. 1187. Upon exam, his diplopia was noted to be stable. Tr. 1186-87, 1189-90. Plaintiff was counseled on "the importance of tight glucose control" and instructed to "[f]ollow up in 1 year." Tr. 1187.

The last chart note in the record before the Court is from October 2018. Tr. 1196. Plaintiff sought "refills of controlled substances as well as to discuss lab results. He is concerned about his diabetic control [but] continues to smoke and use marijuana." *Id.* Dr. Wojcik informed plaintiff that his "A1c remains uncontrolled despite his efforts with diet and exercise as well as maximum dose of metformin 1000 mg twice daily" and that he "needs to lose significant amount of weight," and instructed him to follow-up in three months. Tr. 1203-06. The ALJ reasonably inferred from this evidence that plaintiff's allegedly disabling impairments were not as limiting as alleged.

In sum, the ALJ provided clear and convincing reasons, supported by substantial evidence, for rejecting plaintiff's subjective symptoms statements.

## CONCLUSION

For the reasons stated above, the Commissioner's decision is AFFIRMED, and this case is DISMISSED.

IT IS SO ORDERED.

DATED this 5th day of May, 2023.

/s/ Jolie A. Russo<br>
Jolie A. Russo<br>
United States Magistrate Judge